Annmarie Chiarello
Texas Bar No. 24097496
Jason A. Enright
Texas Bar No. 24087475
Steffen R. Sowell[1]
Texas Bar No. 24107926
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 745-5400
Facsimile:   (214) 745-5390
E-mail:  achiarello@winstead.com
E-mail:  jenright@winstead.com
E-mail:  ssowell@winstead.com

**ATTORNEYS FOR JASON SUBOTKY, INDIVIDUALLY AND AS TRUSTEE FOR THE JASON SUBOTKY FAMILY REMAINDER TRUST, STEPHEN YACKTMAN, INDIVIDUALLY AND AS TRUSTEE FOR THE STEPHEN YACKTMAN FAMILY REMAINDER TRUST AND THE ELLYN YACKTMAN FAMILY REMAINDER TRUST, AND ELLYN YACKTMAN, INDIVIDUALLY**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re | § | **Chapter 11** |
| | § | |
| **EVE FINANCIAL, INC.,** | § | **Case No. 23-43335 (MXM)** |
| | § | |
| Debtor. | § | |
| | § | |
| **JASON SUBOTKY, INDIVIDUALLY AND AS TRUSTEE FOR THE JASON SUBOTKY FAMILY REMAINDER TRUST, STEPHEN YACKTMAN, INDIVIDUALLY AND AS TRUSTEE FOR THE STEPHEN YACKTMAN FAMILY REMAINDER TRUST AND THE ELLYN YACKTMAN FAMILY** | § § § § § § § § § § | **Adversary No. _____** |

---

[1] Resident in Winstead's Houston office, 600 Travis Street, Suite 5200, Houston, Texas 77002, Telephone: (713) 650-8400, Facsimile: (713) 650-2400.

---

**ORIGINAL COMPLAINT**                                                              **Page 1 of 19**

| REMAINDER TRUST, AND ELLYN YACKTMAN, INDIVIDUALLY, | § § § |
|---|---|
| | § |
| Plaintiffs, | § |
| | § |
| vs. | § |
| | § |
| EVE FINANCIAL, INC., | § |
| | § |
| Defendant. | § |

## ORIGINAL COMPLAINT
## OBJECTING TO DISCHARGEABILITY OF A DEBT UNDER 11 U.S.C. § 523

Jason Subotky, individually and in his capacity as Trustee for the Jason Subotky Family Remainder Trust, Stephen Yacktman, individually and in his capacity as Trustee for the Stephen Yacktman Family Remainder Trust and the Ellyn Yacktman Family Remainder Trust, and Ellyn Yacktman, individually (collectively, the "Plaintiffs" and each a "Plaintiff"), file this *Original Complaint Objecting to Dischargeability of a Debt Under 11 U.S.C. § 523* (this "Complaint") against Eve Financial, Inc. (the "Debtor" or the "Defendant"), the debtor in the above-captioned bankruptcy case (the "Bankruptcy Case") and the defendant in the above-captioned adversary proceeding (the "Adversary Proceeding"), and respectfully state as follows:

### I.       JURISDICTION, VENUE, AND STATUTORY PREDICATE

1.      This Court has subject matter jurisdiction over the Bankruptcy Case and this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  "[D]eterminations as to the dischargeability of particular debts" are core proceedings.  28 U.S.C. § 157(b)(2)(I).  Venue of the Adversary Proceeding in this District is proper under 28 U.S.C. § 1409.

2.      This matter arises under the laws of the United States of America.  The statutory predicate for the relief sought herein is pursuant to 11 U.S.C. §§ 105 and 523.  This Adversary

Proceeding may be brought against the Debtor pursuant to Federal Rule of Bankruptcy Procedure 7001(6) and in accordance with this Court's decision in *In re Duntov Motor Co.*, Nos. 21-40348-MXM-11, 21-04030, 2021 Bankr. LEXIS 3695 at *7-12 (Bankr. N.D. Tex. Aug. 26, 2021).

3.      The Plaintiffs hereby consent to the Court's entry of a final judgment resolving this Adversary Proceeding.

## II.      PARTIES

4.      Plaintiff Jason Subotky is an individual residing in California at 1722 San Remo Drive, Pacific Palisades, CA 90272, and Jason Subotky is the Trustee for the Jason Subotky Family Remainder Trust and may be served with pleadings and process in this Adversary Proceeding through undersigned counsel.

5.      Plaintiff Stephen Yacktman is an individual residing in Travis County, Texas, at 3571 Far West Blvd., #82, Austin, TX 78731, and may be served with pleadings and process in this Adversary Proceeding through undersigned counsel.  Stephen Yacktman is the Trustee for both the Stephen Yacktman Family Remainder Trust and the Ellyn Yacktman Family Remainder Trust.

6.      Plaintiff Ellyn Yacktman is an individual residing in Travis County, Texas, at 3571 Far West Blvd., #82, Austin, TX 78731, and may be served with pleadings and process in this Adversary Proceeding through undersigned counsel.

7.      The Plaintiffs may be served with pleadings and process in this Adversary Proceeding through undersigned counsel.

8.      The Debtor is a company incorporated under the laws of Delaware, and its principal place of business is located at 1261 S. 820 E #200, American Fork, Utah 84003, or wherever it may be found.

### III.   PROCEDURAL BACKGROUND

9.      On November 1, 2023 (the "Petition Date"), the Debtor filed its voluntary petition under Chapter 11, Subchapter V, of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), in the Northern District of Texas, initiating the Bankruptcy Case.

10.     The 341 Meeting of Creditors was first set for December 18, 2023.  *See* Case No. 23-43335, Docket No. 8.

11.     On January 30, 2024, the Debtor filed the *Debtor's Subchapter V Plan of Reorganization* [Docket No. 53] (the "Plan"), in which the Debtor asserts that the Plaintiffs "have converted their equity position to a claim in the instant case" (which the Plaintiffs dispute), and the Plaintiffs "shall receive nothing under the Plan."  Plan at 11.  In the Plan, the Debtor is improperly attempting to strip the Plaintiffs of their ***entire*** equity position in the Debtor (including equity interests not subject to repurchase under the Agreement (defined below)), while, at the same time, attempting to subordinate the Plaintiffs' claim in the Bankruptcy Case, so that the Plaintiffs receive nothing for their Claim (defined below) or equity.[2]

### IV.   RELEVANT FACTUAL BACKGROUND

**A.    The Stock Repurchase Agreement**

12.     The Debtor was founded in November 2019.  In December 2019, the Plaintiffs were among the first investors in the Debtor's business, collectively making an initial investment in the amount of $800,000 (made by Jason Subotky and Stephen and Ellyn Yacktman, individually). This initial investment was for Series A Preferred Stock.

---

[2] The Plaintiffs further dispute numerous assertions made in the Plan regarding the history of the Debtor's business, particularly in paragraphs 2.04, 2.05, and 2.06.  The Plaintiffs intend to object to the Plan at the appropriate time.

---

13.     In March 2021, the Plaintiffs further invested $1,263,158 in the Debtor's business in the form of Series A-1 Preferred Stock.  Following the March 2021 Plaintiffs' investments, the Plaintiffs held approximately 9.9% of the equity in the Debtor.  Also, pursuant to the Plaintiffs' equity position, the Plaintiffs held negotiated and valuable shareholder rights, including control and voting rights.

14.     On August 5, 2023, the Debtor and the Plaintiffs entered into that certain Stock Repurchase Agreement (the "Agreement"), whereby the Debtor agreed, *within 120 days*, or by December 3, 2022 (the "Closing Date"), to repurchase 1,052,245 shares of the Plaintiffs' preferred stock (defined as the "Repurchased Shares" under the Agreement) for a total repurchase price of $2,464,673.46 (the "Repurchase Price").   The Agreement contemplated the repurchase of approximately 75% of each of the Plaintiffs' Series A Preferred Stock and Series A-1 Preferred Stock.

15.     The Agreement also required the Debtor to give at least five (5) days' written notice before the Closing Date.  Isaac Freckleton ("Freckleton"), the Chief Executive Officer of the Debtor, executed the Agreement on behalf of the Debtor.

16.     Also on August 5, 2023, in conjunction with the Agreement, Freckleton signed that certain Compliance Certificate, whereby Freckleton certified the truthfulness of the Debtor's representations under the Agreement and that he would "oversee performance of the obligations of the Company contained in the Repurchase Agreement in his role as a corporate officer and director, and will ensure timely compliance by Company with the terms of the Repurchase Agreements [*sic*] in all respects[.]"

17.     When the Plaintiffs entered into the Agreement, the Plaintiffs relied on the Debtor's and Freckleton's promise that the Debtor would repurchase the Plaintiffs' shares within 120 days.

---

The Plaintiffs would not have entered into the Agreement otherwise.  The Plaintiffs were justified in relying on the Debtor's and Freckleton's promise because, among other reasons, the Debtor was represented by counsel, and during the negotiations the Debtor and Freckleton represented that they were in contact with potential investors who could repurchase the Plaintiffs' shares.

18.     As set out below, when the Debtor entered into the Agreement, and Freckleton signed the Compliance Certificate, the Debtor and Freckleton knew that the Debtor could not meet the Agreement's 120-day deadline to repurchase the Plaintiffs' stock, and the Debtor and Freckleton never intended to perform under the Agreement.

19.     Further, as set out below, after the Debtor entered the Agreement, the actions of the Debtor and Freckleton demonstrated that the Debtor and Freckleton never intended to perform under the Agreement.

**B.     The Debtor Never Intended to Perform Under the Agreement.**

20.     After the Plaintiffs' initial investments, at different times, the Debtor and Freckleton attempted to raise additional capital from the Plaintiffs (in the form of both debt and equity).

21.     In February 2022, the Debtor and Freckleton proposed an additional capital raise that would have required additional capital from the Plaintiffs at an implied valuation that the Plaintiffs disagreed with.  Additionally, Freckleton's brother, Dustin Freckleton (who also held equity in the Debtor), was not intending to contribute additional capital during this proposed funding round.  Notably, Dustin Freckleton, unlike Isaac Freckleton, is not an employee of the Debtor so it was unclear why Dustin Freckleton was not asked to contribute pro-rata like the Plaintiffs.  The Plaintiffs rebuffed this proposal, viewing it as an improper degradation of their equity position and disparate treatment as compared with the treatment of Dustin Freckleton's equity position.

22.     During the first half of 2022, the Debtor and Freckleton also took steps in an attempt to limit the Plaintiffs' equity rights in connection with certain funding proposals.  In fact, on information and belief, the Debtor and Freckleton colluded with another of the Debtor's investors, Allegis NL Capital LP or an affiliate thereof ("Allegis"), to covertly strip the Plaintiffs of their valuable equity rights, including rights of control, voting, and potentially, in certain circumstances, economic rights.

23.     To achieve this, on or about May 29, 2022, the Debtor and Freckleton pressured the Plaintiffs to sign signature pages for equity-related documents that were not simultaneously sent to the Plaintiffs or the Plaintiffs' counsel—*by sending only signature pages directly to the Plaintiffs via DocuSign*.  Again, the equity-related documents, if executed, would have stripped the Plaintiffs of their valuable equity rights, including rights of control, voting, and potentially, in certain circumstances, economic rights, and given those rights to Allegis.

24.     After discovering the Debtor's and Freckleton's scheme, on or about June 2, 2022, the Plaintiffs asked Freckleton to work to find a solution that would allow the Plaintiffs to exit their position in the Debtor's business or allow the Plaintiffs to maintain their contractual equity rights, including certain veto rights.

25.     Following weeks of negotiation, by email on June 17, 2022, after alleging that the Debtor could not find a buyer to purchase the Plaintiffs' shares and acknowledging that venture capital investing had seen "a big slow down as the public markets pull back," *the Debtor*, through counsel, proposed that "**Eve will enter into a binding obligation to directly or indirectly purchase Stephen and Jason's shares within 120 days at 1.2x cost**."

26.     On June 24, 2022, through counsel, the Plaintiffs proposed that, based on a $20 million valuation (which was a much lower valuation than the Debtor and Freckleton had

recently asserted), the Plaintiffs would receive a note for 80% of the Plaintiffs' shares, due in 120 days, and when paid, the remaining 20% of the Plaintiffs' shares would be in common stock.

27.     On June 28, 2022, through counsel, the Debtor accepted the $20 million valuation and that certain protective provisions would remain in place, but the Debtor proposed that the Plaintiffs' shares should be repurchased via a contractual agreement, rather than by a note.

28.     In a turnabout, on July 1, 2022, through counsel, the Debtor stated via email:  "The one sticking point is the timing to complete the buyout.  The company would prefer to stick at 12 months.  In the interests of full transparency, **the company believes it needs a minimum of 8 months**, but would prefer 12 months so that there is some air cover." (emphasis added).  Thus, on July 1, 2022, the Debtor and Freckleton knew that the Debtor could not repurchase the shares in 120 days (as they had originally proposed).

29.     Later that same day, on July 1, 2022, counsel for the Debtor stated via email:

> I asked Isaac [Freckleton] to write out his thoughts which he included below.
> At the agreed price per share, Eve has not yet found a buyer, including other existing shareholders.  As company has only begun to launch the new product, in order to arrange capital at the discussed price, **company believes it will need 6 months of time in the market and the associated lending data, and an additional 60 days to find a purchaser**.  If existing shareholders had committed, we'd be able to meet the proposed deadline.  **120d is simply not possible.** (emphasis added).

30.     On July 6, 2022, through counsel, the Debtor stated via email:

> [T]he VC markets continue to deteriorate and we are at risk of losing Allegis as a lead in this round.  We can't just create a buyer and we don't have enough cash on the balance sheet to effectuate this sale absent a buyer, so we are just being really frank about the reality of the situation.

31.     Despite explaining and reiterating that the Debtor could not repurchase the Plaintiffs' shares within 120 days, on July 13, 2022, through counsel, the Debtor stated via email:

> After lots of discussion the company is prepared to accept your offer to buy out 75% of the shares within 120 days, on the terms we have discussed. The purchase price for 75% is $2.46mm (you'd rounded to $2.5mm so want to make we have alignment). We will prepare the documents and circulate this week.

32. On July 14, 2022, through counsel, the Debtor emailed the first draft of the Agreement to the Plaintiffs. In the first draft of the Agreement, the Debtor shamelessly attempted to commit the Plaintiffs to executing amendments that would give Allegis and the Debtor veto rights that they had been attempting to wrest from the Plaintiffs since the beginning of 2022. Further, the Debtor engineered trap doors in the draft Agreement to avoid payment altogether through various mechanisms. For example, one provision in the draft Agreement allowed the Debtor to terminate the Agreement by simply letting the 120-day period expire, with no repercussions to the Debtor: "This Agreement will terminate on the Closing Deadline if the Company has not previously delivered the Closing Notice to Sellers in accordance with this Section 2(a) as of such date."

33. The first draft of the Agreement makes evident that the Debtor and Freckleton were still attempting to take advantage of the Plaintiffs and avoid purchasing the Plaintiffs' shares at the agreed upon price. Also made evident is the fact that the Debtor and Freckleton knew that the Debtor could not meet the 120-day repurchase deadline.

34. Still, after the Plaintiffs' counsel made comments and corrections to the draft Agreement, on July 24, 2022, through counsel, the Debtor stated via email that the Debtor accepted most of the Plaintiffs' comments and changes, and that the Debtor intended to move to execute the Agreement the following week.

35. Then, surprisingly, on the morning of July 26, 2022, through counsel, the Plaintiffs received an email from the Debtor and Allegis that the repurchase deal was off, blaming market

conditions.  This further demonstrates that the Debtor and Freckleton did not believe the Debtor could meet the Agreement's 120-day deadline to repurchase the Plaintiffs' shares.

36.    Despite Allegis' push days earlier to cancel the deal, on July 29, 2022, through counsel, the Debtor stated via email:  "After discussion with Allegis, they are still in favor of pushing through with the repurchase."

37.    On August 5, 2022, the Debtor and the Plaintiffs executed the Agreement.

38.    Upon information and belief, after the Debtor entered into the Agreement, the Debtor and Freckleton failed to take any meaningful steps to ensure the Debtor's performance under the Agreement.  Indeed, after entering the Agreement:

- In emails to investors, Freckleton never mentioned the Debtor's liability to repurchase the Plaintiffs' shares, and the obligation was not included in materials provided to investors (including the board's slide deck in November 2022).

- In an email from Freckleton to investors on November 16, 2022 (a few weeks before the repurchase was due), Freckleton states that the Debtor is "targeting a Series A raise at the end of Q1/23"—indicating that Freckleton does not expect to have funds until the end of Q1 of 2023, and the Debtor would not be able to meet the December 3, 2022 repurchase deadline.

- The Debtor and Freckleton did not include the Debtor's liability under the Agreement on any of the Debtor's balance sheets between August and December 2022.

---

**ORIGINAL COMPLAINT**                                                                 **Page 10 of 19**

39.     The Debtor was able to raise money after the execution of the Repurchase Agreement.  In fact, in November 2022, the Debtor raised $450,000 from two venture capital funds.

40.     Despite the Agreement's requirement that the Debtor give at least five days' written notice to the Plaintiffs before the Closing Date, the Debtor failed to ever provide such written notice of closing, and closing never occurred.  Consequently, the Debtor never paid the Plaintiffs any portion of the Repurchase Price.

41.     As demonstrated above, when the Debtor entered into the Agreement on August 5, 2022, the Debtor and Freckleton knew the Debtor could not repurchase the Plaintiffs' stock by the Closing Date, and the Debtor had no intention of performing under the Agreement.[3]  Thereafter, until the Closing Date, the actions of the Debtor and Freckleton further show that the Debtor had no intention of performing under the Agreement.

**C.     The Plaintiffs Obtain a Judgment Against the Debtor.**

42.     On December 6, 2022, the Plaintiffs filed their *Original Petition* against the Debtor, before the 345th Judicial District Court of Travis County, Texas (the "State Court"), under Cause No. D-1-GN-22-006979, for breaching the Agreement.

43.     On August 7, 2023, the State Court entered its *Order Granting Final Summary Judgment* (the "Judgment") against the Debtor, awarding the Plaintiffs $2,464,673.46, together with interest in the amount of eighteen percent (18%) per annum to accrue from December 4, 2022, until and unless such Judgment is satisfied in its entirety, plus $30,000.00 for attorneys' fees and court costs.

---

[3] At Freckleton's deposition on February 12, 2024, Freckleton admitted that on August 5, 2022, the Debtor did not have the funds to repurchase Plaintiffs' shares, and that on December 3, 2022, the Debtor still did not have the funds to repurchase the Plaintiffs' shares.

44.     The Judgment is final and has not been superseded by any bond or security.  The Judgment was not timely appealed.

45.     As of the Petition Date, based on the Judgment, the Debtor was indebted to the Plaintiffs in the amount of at least $2,898,204.65, less all applicable credits, plus all other fees, interest, costs, and expenses incurred and that continue to accrue with respect to the Judgment, including, but not limited to, attorneys' fees and costs, in addition to the Plaintiffs' future attorneys' fees and costs in an as yet to be determined amount, to the extent permitted by the Bankruptcy Code and applicable law (collectively, the "Claim").

46.     On January 7, 2024, the Plaintiffs filed their Proof of Claim in the claims register of the Bankruptcy Case, as Claim No. 3-1, evidencing the Claim.

## V.     CAUSES OF ACTION

### Count 1:  Objection to Dischargeability Under 11 U.S.C. § 523(a)(2)(A)

47.     The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

48.     Under Section 523(a)(2)(A) of the Bankruptcy Code, the Debtor is not discharged of "any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"  11 U.S.C. § 523(a)(2)(A).

49.     The Plaintiffs are entitled to bring a claim against the Debtor pursuant to Section 523(a)(2)(A), as this case is pending under Subchapter V of the Bankruptcy Code.  *See Cantwell-Cleary Co. v. Cleary Packaging, LLC (In re Cleary Packaging, LLC)*, 36 F.4th 509, 517 (4th Cir. 2022) ("[W]e find more harmony from following a close textual analysis and contextual review of § 1192(2) and thus conclude that it provides discharges to small business debtors, whether they are individuals or corporations, except with respect to the 21 kinds of debts listed in § 523(a)."); *see also Duntov Motor*, 2021 Bankr. LEXIS 3695 at *7-12.

50.     To show actual fraud under Section 523(a)(2)(A), a plaintiff must prove (i) a material representation was made, (ii) the representation was false, (iii) when the representation was made, the party making it knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (iv) the representation was made with the intent that the creditor should act upon it, (v) the creditor acted in reliance on the representation, and (vi) the creditor thereby suffered an injury.  *See Saenz v. Gomez*, 899 F.3d 384, 391 (5th Cir. 2018) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).

51.     To show false pretenses and false representations under Section 523(a)(2)(A), the creditor must prove: (i) the existence of a knowing and fraudulent falsehood, (ii) describing past or current facts, (iii) that was justifiably relied upon by the creditor.  *See RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).  With respect to a future action, the creditor must establish that the party making the representation had no intention of fulfilling the promise or representation at the time the representation was made.  *Beshears v. McCool (In re McCool)*, Adv. No. 16-43206, 2019 BL 372248, at *17 (Bankr. N.D. Tex. Sept. 30, 2019) (citing *In re Allison*, 960 F.2d 481, 484 (5th Cir. 1992)).

52.     The Claim is based on a debt for money, property, or services, as provided by the Agreement, obtained by false pretenses, a false representation, and/or actual fraud.

53.     The Debtor committed actual fraud in connection with the Agreement.  The Debtor, through its agents or representatives, including Freckleton, made material and false representations to the Plaintiffs that it would repurchase the Plaintiffs' shares of the Debtor within 120 days when the Debtor and Freckleton knew the Debtor would not be able to consummate the repurchase under the Agreement, and the Debtor and Freckleton never intended to perform under the Agreement. Thus, such representations that the Debtor would perform, and Freckleton's certification that he

would ensure the Debtor's performance, were false.  The Debtor knew these representations were false when made, and/or made them recklessly, as a positive assertion, without any knowledge of the truth.  The Debtor intended for the Plaintiffs to rely and act upon these misrepresentations, and the Plaintiffs did rely on these representations when entering into the Agreement.  As a result of the Plaintiffs' reliance upon the Debtor's misrepresentations, the Plaintiffs suffered damages, which constitutes the Plaintiffs' Claim.

54.     The Debtor also acted with false pretenses and made false representations in connection with the Agreement.  When the Debtor, through its agents or representatives, including Freckleton, represented to the Plaintiffs that the Debtor would repurchase the Plaintiffs' shares within 120 days, the Debtor and Freckleton had no intention of fulfilling the promise or representation at the time the promise or representation was made.  The Debtor and Freckleton knew the representation was a fraudulent falsehood at the time the promise was made.  The Plaintiffs justifiably relied upon such representations because, among other reasons, the Debtor was represented by counsel, and the Debtor and Freckleton represented that they were in contact with potential investors who could repurchase the Plaintiffs' shares in the Debtor.  Thus, the Debtor acted with false pretenses and made false representations to induce the Plaintiffs to enter into the Agreement, which resulted in the Plaintiffs' Claim.

55.     The Court should therefore except the Claim from discharge under Section 523(a)(2)(A) of the Bankruptcy Code.

### *Count 2:  Objection to Dischargeability Under 11 U.S.C. § 523(a)(19)*

56.     The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

57.     Under Section 523(a)(19) of the Bankruptcy Code, the Debtor is not discharged of

any debt . . . that—

(A)    is for—

(i)    the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii)    common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B)    results, before, on, or after the date on which the petition was filed, from—

(i)    any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

(ii)    any settlement agreement entered into by the debtor; or

(iii)    any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor[.]

11 U.S.C. § 523(a)(19).

58.    Accordingly, Section 523(a)(19) has two requirements:  "First, the debt at issue stems from a securities law violation or fraud in connection with the sale of a security.  Second, the debt results from a settlement agreement, decision, judgment, order, or decree in a judicial or administrative proceeding." *Holzhueter v. Groth (In re Holzhueter)*, 571 B.R. 812, 822-23 (Bankr. W.D. Wis. 2017) (internal citations omitted).  Further, a bankruptcy court may adjudicate the claim for a securities law violation.  *See id*. at 823-24.

59.    As described above, the Plaintiffs' Claim stems from the Debtor's and Freckleton's fraud, deceit, or manipulation in connection with the Debtor's repurchase of the Repurchased Shares, as contemplated under the Agreement.  Specifically, the Debtor deceived and manipulated

the Plaintiffs in connection with the Agreement because the Debtor and Freckleton knew that the Debtor could not consummate the repurchase of the Plaintiffs' shares, and the Debtor and Freckleton never intended to perform under the Agreement. The Repurchased Shares are "securities" as defined under Section 101(49)(A)(ii) of the Bankruptcy Code, as they are stock.

60.     The Plaintiffs have obtained a judgment, the Judgment, for the debt resulting from the Debtor's and Freckleton's fraud, deceit, or manipulation in connection with the repurchase of the Plaintiffs' stock in the Debtor. Further, this Court may adjudicate the Debtor's claim that the Debtor's actions in connection with the Agreement constitutes a securities law violation. *Id.*

61.     The Court should therefore except the Plaintiffs' Claim from discharge under Section 523(a)(19) of the Bankruptcy Code.

### *Count 3: Attorneys' Fees and Costs*

62.     The Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

63.     To the extent the Plaintiffs are entitled under applicable law to attorneys' fees and costs in connection with prosecuting this Adversary Proceeding and recovering the Plaintiffs' debt, the Plaintiffs request recovery of their attorneys' fees and costs incurred in connection with the same. *Horton v. Robinson (In re Horton)*, 85 F.3d 625, 1996 WL 255304, at *5 (5th Cir. May 3, 1996) (unpublished) ("Attorneys' fees are non-dischargeable under § 523 when they 'stem from the same basis as the non-dischargeable debt.'"); *see also Cohen v. de la Cruz*, 523 U.S. 213, 220 (1998) (reasoning that the phrase "[d]ebt for" in Section 523 includes not only the judgment amount found non-dischargeable, but also the "debt arising from" and "debt on account of" the misconduct giving rise to the judgment).

## VI. **<u>PRAYER</u>**

The Plaintiffs respectfully request that the Court: (i) enter judgment declaring that the Plaintiffs' Claim is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(19); (ii) enter judgment against the Debtor for attorneys' fees and costs incurred in connection with the prosecution of this Adversary Proceeding; and (iii) grant any other such relief that the Plaintiffs may show themselves to be justly entitled in law or in equity.

**DATED: February 15, 2024**

*[Remainder of Page Left Blank]*

Respectfully submitted,

By:  */s/ Annmarie Chiarello*
    Annmarie Chiarello
    Texas Bar No. 24097496
    Jason A. Enright
    Texas Bar No. 24087475
    Steffen R. Sowell[4]
    Texas Bar No. 24107926
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 745-5400
Facsimile:   (214) 745-5390
E-mail:  achiarello@winstead.com
E-mail:  jenright@winstead.com
E-mail:  ssowell@winstead.com

**ATTORNEYS FOR JASON SUBOTKY, INDIVIDUALLY AND IN HIS CAPACITY AS TRUSTEE FOR THE JASON SUBOTKY FAMILY REMAINDER TRUST, STEPHEN YACKTMAN, INDIVIDUALLY AND IN HIS CAPACITY AS TRUSTEE FOR THE STEPHEN YACKTMAN FAMILY REMAINDER TRUST AND THE ELLYN YACKTMAN FAMILY REMAINDER TRUST, AND ELLYN YACKTMAN, INDIVIDUALLY**

---

[4] Resident in Winstead's Houston office, 600 Travis Street, Suite 5200, Houston, Texas 77002, Telephone: (713) 650-8400, Facsimile: (713) 650-2400.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2024, notice of this document will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this adversary proceeding pursuant to the Electronic Filing Procedures in this District.  Service will also be made as required and allowed by Federal Rule of Bankruptcy Procedure 7004.

*/s/ Annmarie Chiarello*
One of Counsel